**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ESTATE OF RICHARD MATUS, JR., et al.,

Plaintiffs,

v.

COUNTY OF RIVERSIDE, et al.

Defendants.

Case No. 5:23-cv-00506-SSS-SPx

**COURT EXHIBIT NO. 1: FINDINGS OF FACT**

**COURT EXHIBIT NO. 1: FINDINGS OF FACTS ADJUDICATED BY COURT**

After review of the evidence, in a prior proceeding, the Court has determined and adjudicated that certain facts are unrefuted. As a result (regardless of any statements, contentions, allegations, arguments, or testimony by any party, witness, expert, or attorney in this case), you shall treat the following facts as having been proved to be true and undisputed by the parties.

## FINDINGS OF FACT

**Jail Location and Layout**

1. On August 10, 2022, Richard Matus was incarcerated at the Cois M. Byrd Detention Center ("CBDC"): a County jail located in Murrietta, California.
2. On that date, the CBDC was owned and operated by the Riverside County Sheriff's Department, an agency of defendant County of Riverside.
3. Custodial deputies are in charge of the operation of the jail. Correctional deputies have a duty to ensure the safety and security of their facility by monitoring the inmates.
4. At the CBDC, the layout of the cells is as follows. There are "pods" of cells with one common room called a "dayroom." Each Pod also features a guard control room from which correctional deputies can monitor inmates through a (tinted) window, a video surveillance feed (from a camera in the dayroom), and an intercom in each cell. It is good practice for deputies to watch the dayrooms and security cameras' video.
5. On the incident date of August 10 through 11, 2022, Mr. Matus was a pre-trial detainee housed in the CBDC's E Pod, in Dayroom 2, Cell 41.
6. On the night of August 10 through August 11, 2022, Mr. Matus' only cellmate was Anthony Hernandez.

**Cell Intercom Call Practices**

7. According to the Sheriff's Department's training and policies, each Pod's security control room must always be staffed by at least one correctional deputy. This deputy is referenced as the "primary" deputy.
8. From the Pod's security control room, the primary deputy can receive intercom calls from the inmates in that Pod's cells; and the primary deputy can open the doors of any cell in that Pod.
9. Pursuant to Sheriff's Department training, when intercoms are activated by inmates, deputies in the Pod security control room will activate the button to

communicate with the inmate caller. When deputies in the Pod security control room receive an intercom call, the intercom system emits a chime that does not stop until that intercom call is answered.

10. Deputies in the Pod security control room can only receive one intercom call at a time.

11. The only way for inmates locked in their cells to get the attention of the deputy in the Pod security control room is through the intercom.

12. The primary purpose of the cell intercoms is for inmates to be able to summon deputies in case of emergencies.

13. At orientation, inmates are specifically instructed that, in case of medical emergency, they are to use the intercom to report the emergency.

14. The Sheriff's Department's policies and training require that deputies staffing a Pod security control room must answer all intercom calls received, in case inmates report an emergency. But the intercoms are used for pretty much any reason to get the deputies' attention.

15. A Pod security center must be staffed with at least one correctional deputy. If a primary deputy is alone in the control room when he or she receives an emergency intercom call, the primary deputy must use a radio or telephone to request that another deputy or staff member serve as a "runner" who can personally check on the emergency. In other words, without a runner, a primary deputy would not be able to personally check on an inmate's medical emergency.

16. At times in 2022, CBDC was at minimum staffing levels. The understaffing issue at CBDC has been ongoing as long as Dep. Correa has been assigned to CBDC. Because of the low staffing levels, there were times when a "runner" would not be available.

17. Failure to maintain adequate staffing levels jeopardizes inmates' safety and welfare.

18. However, there is no evidence in this specific case that any understaffing at the CBDC, or any custom or practice related to such staffing was the moving force behind Mr. Matus' death.

**Jail Safety Checks**

19. For inmates (like Mr. Matus) who are not housed under special circumstances, Sheriff's Department policies and training dictate that deputies are to conduct safety checks on the inmates once every 60 minutes.

20. The safety check process entails deputies ordering inmates to return from the dayroom into their assigned cells, if the inmates are not already there.

21. Once the inmates are secured in their cells, one or more deputies will then conduct a check on every cell in the Pod. This check includes: (a) visually confirming that inmates are housed in the correct cell; and (b) visually confirming that inmates are safe, breathing, otherwise uninjured, and – unless asleep – alert and responsive.

22. Safety checks are the number one tool that correctional officers can rely upon to ensure the safety and welfare of the inmates.

23. However, one purpose of performing safety checks is to ensure the visibility of deputies among inmates: because the presence of custody staff can prevent problems from occurring.

24. At the time of the incident at issue in this case, the Sheriff's Department's practice regarding hourly safety checks was that they were to be counted from the end time of the previous check. For example, if a round of safety checks for a Pod started on Cell A at 12:00 p.m., and ended on Cell Z at 12:15 p.m., then the Department's policy was that the next round of security checks needed to be started by 1:15 p.m.

25. These safety checks were then electronically documented, or logged, in the Jail Information Management System, or JIMS. This JIMS would then alert a deputy in the Pod security control room when the next round of safety checks

should occur.

26. On August 10, 2022, CBDC personnel conducted a safety check on the cells of the E Pod from 7:53 p.m. to 8:14 p.m. This safety check was logged by defendant Deputy Mario Correa.

27. Later that night, CBDC personnel conducted a safety check on the cells of the E Pod from 9:11 p.m. to 9:24 p.m. This safety check was logged by defendant Deputy Angel Rojas, who also conducted the safety check himself. When Deputy Rojas conducted this safety check, he heard Mr. Matus talking with Mr. Hernandez. At that time, Mr. Matus did not show any signs of injury or of any medical problems.

28. Later that night, Byrd jail personnel conducted a safety check on the cells of the E Pod from 10:22 p.m. to 10:55 p.m. This safety check included a "stat count" (or head count) for the inmates, including those in Mr. Matus's cell. During that safety check, both Mr. Matus and Mr. Hernandez answered to the stat count with their first names. Both inmate Matus and inmate Hernandez also appeared to be uninjured and without any signs of medical distress.

29. The evidence shows that these safety checks were all timely done.

30. Safety checks were often conducted in an "overly hasty fashion." However, Defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson did not conduct any hasty safety checks such that they acted with any objective deliberate indifference for Mr. Matus's exposure to contraband and his eventual death.

31. Thus, for the incident safety checks regarding Mr. Matus, there is no evidence that the presence of Fentanyl and "pruno"[1] was a result of inadequate safety checks.

---

[1] Pruno is an improvised alcoholic beverage.

32. As a result, the adequacy or timeliness of the Sheriff's Department's policies or practices, or any of the defendant deputies' associated conduct, for conducting safety checks on inmates or their cells is not a fact for this jury to decide.

**Jail Drug/Contraband Screening**

33. In 2022, fentanyl was an "epidemic" at the Byrd jail. In that year, various Riverside County jails experienced close to 100 inmate drug overdoses, 7 of which resulted in death.

34. The Sheriff's Department took actions to address overdose incidents in jails.

35. At the time of the incident at issue in this case, pursuant to Sheriff's Department policies and procedures, in addition to the hourly safety checks, deputies at the CBDC conducted regular contraband checks in the cells and dayrooms: so as to ensure that contraband was not concealed in inmate housing areas.

36. Additionally, at the time of the Mr. Matus' death, and pursuant to Sheriff's Department policies and procedures, as part of the inmate intake process, CBDC had implemented the use of a non-intrusive sensor and scanning device known as the Tek-84 scanner. The Tek-84 scanner uses X-rays to detect drugs, weapons, or other contraband on or inside a person's body.

37. The Sheriff's Department also had policies and procedures in place regarding medical care for incarcerated persons: including use of naloxone (also known as Narcan) to redress drug overdoses.

38. On August 10, 2022, between about 8:00 p.m. and 10:00 p.m., Mr. Matus and Mr. Hernandez were consuming "pruno" in the cells of other inmates. Pruno is an improvised alcoholic beverage.

39. Nevertheless, there is no evidence that shows or suggests that defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson – or any reasonable deputy – had any reason to believe that Mr. Matus was exposed to

any contraband on the night of the incident.

40. There is no evidence that any of these defendant deputies gave Mr. Matus any pruno, fentanyl, or other contraband.

41. The mere presence of pruno, fentanyl, or other contraband is not evidence of inadequate checks; and the mere presence of such contraband is not evidence that defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson permitted the proliferation of contraband at CBDC.

42. There is also no evidence that the Riverside County Sheriff's Department had any policies or widespread and longstanding practices of inadequate screening of contraband in its jails.

43. Thus, there is no evidence that the screening or checks for drugs or other contraband at the Byrd jail was inadequate.

44. As a result, the adequacy of the Sheriff's Department's policies or practices, or the conduct of any defendant deputy, for screening or checking for contraband like fentanyl or pruno is not a fact for this jury to decide; and you shall not consider that issue in your deliberations.

**Undisputed Incident Facts**

45. As previously stated, the last safety check conducted on Mr. Matus' cell occurred on August 10, 2022: between 10:22 p.m. to 10:55 p.m.

46. During that safety check, Mr. Matus answered a stat count with his first name; and he appeared to be uninjured and without any signs of any medical distress.

47. At about 11:11 p.m., jail surveillance video shows Mr. Matus walking around his cell.

48. At some point after consuming pruno and returning to Cell 41, Mr. Hernandez saw Mr. Matus holding his chest, as though he was having medical problems.

49. Inmate Hernandez used the in-cell intercom to alert CBDC personnel that Mr. Matus was suffering from a medical problem.

50. The parties dispute as to how many calls Mr. Hernandez made to alert the Corrections Officer Defendants about Mr. Matus' medical problems. Although both parties agree that there was a "man-down" call at around 11:28 p.m. that led deputies to respond, Plaintiffs contend there was also an earlier call that was deliberately ignored by one or more of the defendant deputies – defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson.

51. At around 11:28 p.m., while Deputy Thompson was delivering a headcount document for the E Pod, the primary deputy in the E Pod security control room, Deputy Rojas, asked Deputy Thompson to go check on Mr. Matus' cell because "something" was happening.

52. While Deputy Thompson was en route to Cell 41, Deputy Rojas received an intercom call from Mr. Hernandez in Cell 41 for a man-down.

53. A "man-down" intercom call is a call for emergency medical help for an inmate.

54. In response to this "man-down" intercom call, Deputy Rojas radioed that there was a "man down" in Matus' cell: to prompt other deputies and medical personnel to check Matus's cell.

55. At around 11:29 p.m., Deputy Thompson then arrived at Mr. Matus' cell. At that point, the deputy saw an unconscious Mr. Matus laying on his back while Mr. Hernandez was standing over him. The Cell 41 door was then opened.

56. Pursuant to the Sheriff's Department's training and procedures, Deputy Thompson waited for back-up deputies to arrive before having the door to Cell 41 opened.

57. Medical staff then arrived, "staging" nearby, while awaiting other deputies to back-up Deputy Thompson.

58. At about 11:30 p.m., once back-up deputies arrived at Mr. Matus' cell, the door to Cell No. 41 was opened.

59. The medical personnel at the cell then started providing medical aid to Mr.

Matus, including: chest compressions and rescue breathing (CPR) and attempted use of an automatic external defibrillator (or AED).

60. It was consistent with reasonable and appropriate standard jail practices for the deputies, including any defendants, to wait for back-up deputies to arrive at the scene before opening Mr. Matus's cell door or providing medical aid to him.

61. At about 11:49 p.m., Cal-Fire paramedics arrived at Mr. Matus' cell to takeover from the jail medical staff lifesaving efforts on Mr. Matus. At about 11:54 p.m., AMR paramedics also arrived to assist in the lifesaving efforts.

62. However, at about 12:15 a.m. on August 11, 2022, Mr. Matus was pronounced dead.

**Autopsy Results**

63. On August 11, 2022, County medical examiner Dr. Zuhha Ashraf conducted an autopsy exam on Mr. Matus.

64. Mr. Matus' autopsy toxicology results showed that he had a blood alcohol content of 0.163%: twice the legal driving limit. It also showed that he had 0.041 milligrams per liter of Benadryl in his system. It also showed that, at the time of his death, Mr. Matus had 0.0041 milligrams per liter of Fentanyl in his system; as well as significant quantities of 4-ANPP – a chemical precursor to fentanyl and its opioid analogs.

65. The medical examiners thus concluded that Mr. Matus' cause of death was fentanyl toxicity.

66. The parties do not dispute that the pathological cause of Mr. Matus' death was a drug overdose by fentanyl.

**Miscellaneous**

67. There is no evidence that any supervisor of defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson was personally involved in Mr. Matus' death. None of these deputies' supervisors is a defendant in this action.

68. There is no evidence that any of the defendants Deputies Angel Rojas, Mario Correa, or Brendon Thompson attempted to interfere with Mr. Matus' constitutional rights by threat, intimidation, or coercion.

**Other Stipulated Facts**

69. Richard Matus, Jr. was in the custody of the Riverside County Sheriff's Department from June 29, 2018, and until his death on August 11, 2022.

70. Richard Matus, Jr. died in-custody on August 11, 2022.

71. Richard Matus's cause of death was fentanyl and ethanol toxicity.

72. On August 10, 2022, Richard Matus, Jr. was housed in a two-person cell (E-pod, Cell 41) with Anthony Hernandez.

73. Richard Matus, Jr. was a pretrial detainee.

74. Richard Matus, Jr. was the son of Lisa Matus.

75. Richard Matus, Jr. was the father of G.M. and R.M.

76. Defendants Mario Correa, Angel Rojas and Brendon Thompson acted under color of authority or law during the incident at issue in this action.